UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

THEOLA NEALY,

                    Plaintiff,

          v.                                    Case No.  11-C-0541

PETER NELSEN,
NICOLA BRODLO,
ANGELA D'FANTIS,
MATTHEW GEBHARDT,
MARY PAT SKELLY BOHN,
each in his or her individual and official capacities,

                    Defendants, and

STATE OF WISCONSIN,

                    Intervening Defendant.

DECISION AND ORDER GRANTING MOTION FOR DEFAULT JUDGMENT (DOC.
55); GRANTING MOTIONS TO DISMISS BY MARY PAT SKELLY BOHN (DOC. 40),
NICOLA BRODLO (DOC. 57), AND MATTHEW GEBHARDT (DOC. 65); GRANTING
MOTION FOR SUMMARY JUDGMENT BY ANGELA D'FANTIS (DOC. 67);
AND SETTING A STATUS CONFERENCE

          Theola Nealy sues Peter Nelsen and four other individuals for civil rights violations

related to Nelsen's sexual relationship with Nealy and court proceedings concerning

custody of Nealy's and Nelsen's resulting child.  Before the court are motions for default

judgment against defendant Nelsen, to dismiss claims against defendants Bohn, Brodlo

and Gebhardt, and for summary judgment against defendant D'Fantis.  Each is discussed

below.

          GENERAL ALLEGATIONS OF THE SECOND AMENDED COMPLAINT

          In her Second Amended Complaint Nealy asserts that between 1997 and April

2009, Peter Nelsen was a social worker employed by the Bureau of Milwaukee Child

Welfare (BMCW).  Until September 30, 2009, he was certified as a clinical social worker through a state examining board.  (Doc. 37 at 2.)

On or about July 2007, Nelsen was assigned by the BMCW to investigate an allegation of child abuse regarding Nealy's two children; he concluded that the allegation was unsubstantiated.  After a second allegation regarding abuse was made against Nealy in late August 2007, another BMCW social worker was assigned to an investigation, but Nelsen told Nealy that he had taken over the case.  (Doc. 37 at 4.)

After finding the allegations unsubstantiated, Nelsen continued to appear at Nealy's home, weekly then daily through early November 2007.  Often the visits lasted an hour and the conversations became increasingly intimate.  Nealy was not comfortable with the visits but felt obligated to allow Nelsen into her home and to answer his questions because she knew he could remove her children from her care.  (Doc. 37 at 5.)  When Nelsen visited he displayed his BMCW credentials on a lanyard around his neck.  He told her he had arrest powers over parents suspected of child abuse or neglect and that he could learn anything about her through a database managed by the State of Wisconsin.  Between September and early November 2007, Nelsen had sexual intercourse with Nealy six or seven times.  (Doc. 37 at 6.)  Nealy says she was coerced into having sex with Nelsen because of his control over her children's custody and placement.  (Doc. 37 at 7.)

Through Nelsen's sexual contact with Nealy she became pregnant.  Nelsen told Nealy to get an abortion but she refused.  Within weeks of her refusal to abort the baby, on December 21, 2007, Milwaukee police officers and BMCW social workers seized Nealy's two children.  (Doc. 37 at 7.)

Nealy gave birth to a daughter on August 19, 2008. Nelsen appeared at the hospital and gained access to Nealy by displaying his social worker credentials. (Doc. 37 at 8.) Within a month, Nelsen pressured Nealy to allow him to have visits with the baby. He began keeping the baby for weeks at a time and refused to return the child to Nealy. (Doc. 37 at 11.) Nelsen kept the baby from Nealy entirely, and stated to her that she must do as he said. Although no custody order was in effect, Nelsen also said he would allow Nealy to have only supervised visits with the baby. (Doc. 37 at 12.)

The Second Amended Complaint describes Mary Pat Skelly Bohn as a deputy director with the BMCW, Nicola Brodlo as a "first-line supervisor" of Nelsen at the BMCW, Matt Gebhardt as a "second-line supervisor" of Nelsen at the BMCW, and D'Fantis as a "supervisor of ongoing case managers" with the BMCW. (Doc. 37 at 3.) It further asserts that by February 2009, Nelsen openly posted photos of himself with the baby on Facebook; his Facebook friends included several BMCW coworkers. On at least one occasion in early 2009 he brought the baby to work and Brodlo played with her. (Doc. 37 at 8.) Nelsen dropped off and picked up the baby during work hours. When BMCW colleagues inquired about the infant at Nelsen's house, he told them varying stories, such as that he was providing care for one of his assigned families or that he had found the baby in a van. (Doc. 37 at 12.) Nelsen has said he dropped off and picked up the baby from Nealy's house and at a dental appointment in full view of Nealy's visitation worker or case manager. (Doc. 37 at 9.)

In late winter or early spring 2009, Nealy disclosed the identity of her baby's father to D'Fantis and BMCW ongoing case manager Enrique Lockhart. (Doc. 37 at 8.) In April

3

2009, Nelay told a social worker assigned to oversee the administration of Nealy's Wisconsin Works (W-2) benefits that Nelsen was the baby's father.[1]  (Doc. 37 at 9.)

On April 7, 2009, after BMCW was notified by Nealy's W-2 worker of the inappropriate sexual relationship, BMCW placed Nelsen on administrative leave.  (Doc. 37 at 17.)  On April 8, 2009, the BMCW directed Nelsen to appear at its administrative office to answer questions about his relationship with a female client of the BMCW.  (Doc. 37 at 9.)  The BMCW issued a letter, signed by Bohn on April 14, 2009, stating its intent to terminate Nelsen because of his "professional and personal relationship with a female client and her children during 2007 through the present.  In addition, this relationship resulted in the birth of a child."  (Doc. 37 at 10.)  Nelsen then resigned from his position at the BMCW.  (Doc. 37 at 10.)  The Wisconsin Department of Workforce Development found that although Nelsen resigned, the separation was deemed a discharge because Nelsen would have been terminated for violation of policy relating to the relationship with a client.  (Doc. 37 at 17.)

After Nealy disclosed Nelsen's identity as the father, BMCW social workers remained assigned to her family's case in Milwaukee County Children's Court.  (Doc. 37 at 10.)  In July 2009, Nelsen called Nealy's ongoing case manager and questioned whether the visitation worker knew "exactly what [w]as happening" between Nealy and the baby; he said he would never allow Nealy to have access to the baby again.  (Doc. 37 at 13.)  In an August 2009 email to the case manager, Nelsen stated he had obtained information on Nealy's March 2009 psychological evaluation.  (Doc. 37 at 13.)

_____

[1]The Second Amended Complaint alleges this happened in April 2008, but the baby was not yet born at that time.

On August 17, 2009, Nelsen called BMCW's Bridgette Linderman saying he was anxious and worried about the location of the baby. That same day, a BMCW social worker was assigned to a "same day response" referral regarding the baby and was directed, if he found the baby, to detain the child and place her in the care of her father, Peter Nelsen. The BMCW worker seized the baby that day and placed her with Nelsen, prompting an emergency detention action in Milwaukee County Children's Court. (Doc. 37 at 14.)

Not until after a story about Nelsen's conduct was reported in the Milwaukee press, on August 27, 2009, did Bohn report Nelsen's termination to the Wisconsin Department of Regulation & Licensing. (Doc. 37 at 11.) Within days of a media report, three BMCW social workers arrived at Nealy's home and demanded to know why she was causing trouble. (Doc. 37 at 15.)

Until September 9, 2009, BMCW social workers continued to be assigned to Nealy's cases. On or about September 9, 2009, upon motion filed by Nealy's children's court attorney, a Milwaukee County Circuit Court judge ordered BMCW to assign a different social worker to Nealy's children's court case. (Doc. 37 at 16.)

The state licensing department revoked Nelsen's social worker license on September 23, 2009, based on his sexual conduct with Nealy. (Doc. 37 at 15-16.) After Nelsen resigned from BMCW but before his license was revoked, Brodlo continued to advise Nelsen about his child custody issues. (Doc. 37 at 15.)

The Second Amended Complaint asserts a 42 U.S.C. § 1983 claim against Nelsen for violation of due process; two claims against Gebhardt, D'Fantis, Brodlo, and Bohn under 42 U.S.C. § 1985(2) for conspiracy with Nelsen and others to impede, hinder,

5

obstruct, or defeat the due course of justice; and a claim under 42 U.S.C. § 1986 against Gebhardt, D'Fantis, Brodlo and Bohn for failure to act to prevent civil rights conspiracy violations.

MOTION FOR DEFAULT JUDGMENT

For a second time, Nealy seeks default judgment against Nelsen for his failure to serve disclosures under Fed. R. Civ. P. 26 and answers to interrogatories and document requests, after being ordered to do so. Nelsen has failed to respond to the motion for default judgment as well.

Nelsen's Rule 26 disclosures and other discovery responses were due on or about June 2, 2012. His attorney told Nealy's attorney that because of a death in Nelsen's family, discovery would be delayed until June 13, 2012. However, as of June 25, 2012, when Nealy filed her first motion for default judgment, the discovery remained outstanding. Nealy's first motion for default judgment indicated that her attorney attempted to confer with Nelsen's attorney by telephone before filing the motion, but as of the date the motion was filed Nelsen's attorney had not responded to the voice mail message. As an alternative to default judgment, Nealy sought an order compelling Nelsen to provide the discovery.

In an order on November 8, 2012, this court denied the first motion for default judgment without prejudice but granted the motion to compel. The court wrote that default judgment, as an initial sanction before an order to compel, would be too severe. (Doc. 54 at 2.) Instead, the court ordered Nelsen to serve Nealy with his Rule 26 disclosures and answers to interrogatories and document production requests no later than November 15,

6

2012. (*Id.* at 3.) The court warned that it would "not look favorably on any additional delay following the court's order to compel." (*Id.*)

The court held a status conference the following day, November 9, 2012. During that conference, counsel for Nelsen said he had emphasized to Nelsen the importance of full compliance with discovery requests. The court stated that "it should be made clear to Nelsen that if there is an ongoing failure to comply with discovery then the motion for default judgment can be renewed." (Doc. 63 at 2.)

Nelsen failed to comply with this court's order to compel. Nealy then filed her second motion for default judgment on November 19, 2012. As of that date, Nealy's attorney had not received any documents from Nelsen. She left a voicemail with Nelsen's attorney on November 16, 2012, to discuss the matter, but as of November 19 he had not responded. Nealy's motion has not been withdrawn, hence it appears that Nelsen still has not supplied plaintiff with the discovery.

Federal Rule of Civil Procedure 37(a)(3)(A) provides for orders to compel and "appropriate sanctions" for a party's failure to comply with discovery requirements. When a defendant fails to obey a court's discovery order, the court may enter "further just orders," including one granting default judgment. Fed. R. Civ. P. 37(b)(2)(A). Unless the failure to comply with the court order was substantially justified or circumstances exist making an award of expenses unjust, the disobedient party must pay the opponent's reasonable expenses, including attorney's fees, caused by the failure. Fed. R. Civ. P. 37(b)(2)(C).

The sanction of default judgment is serious. Hence, in appropriate cases the court grants a motion to compel then graduates to a sanction of dismissal following violation of the order compelling discovery. The court has done so here. Nelsen was ordered to

7

provide discovery no later than November 15, 2012, and he has failed to comply. By failing to respond to the motion for default judgment, he concedes that the motion has merit. Thus, default judgment is a warranted sanction.[2]   Moreover, Nealy is entitled to reimbursement of her expenses, including costs and attorney's fees, for her motion to compel. *See* Fed. R. Civ. P. 37(b)(2)(C). She should calculate those sums and submit them to the court and Nelsen's counsel.

## MOTIONS TO DISMISS

Defendants Bohn, Brodlo, and Gebhardt move to dismiss the Second Amended Complaint. These defendants are named in counts two, three, and four, alleging violations of 42 U.S.C. §§ 1985 and 1986. However, they are not mentioned anywhere under the section of Nealy's pleading in which she alleges a § 1983 violation.

A Rule 12(b)(6) motion to dismiss challenges the sufficiency of the complaint to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). Rule 12(b)(6) requires a plaintiff to clear two hurdles. *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). First, the complaint must describe the claim in sufficient detail to give a defendant fair notice of the claim and the grounds on which it rests. *Id.* Although specific facts are not necessary, "at some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled." *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007). Second, the complaint must set forth a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974

---

[2]Further, Nelsen failed to file any answer to Nealy's Second Amended Complaint. However, default judgment is being granted for the violations of the court's order and discovery requirements, not the failure to answer the amended pleading.

(2007); *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007). The "allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court." *EEOC*, 496 F.3d at 776 (citing *Bell Atl. Corp.*, 550 U.S. at 555-56, 569 n.14 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).

When considering a Rule 12(b)(6) motion, the court must construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts and drawing all possible inferences in the plaintiff's favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). However, legal conclusions are not accepted as true. A pleading containing only '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not do. *Iqbal*, 556 U.S. at 678.

A.    § 1985(2) Claims

Bohn proffers two arguments for dismissal of the 42 U.S.C. § 1985(2) claim: (1) Nealy's action is barred by the intracorporate conspiracy doctrine; and (2) Nealy fails to assert several specific facts required for a conspiracy claim under § 1985(2). Brodlo and Gebhardt do not pursue the intracorporate conspiracy doctrine but challenge the Second Amended Complaint on the lack of facts meeting specific elements of the § 1985(2) claim, similar to Bohn. In addition, all three defendants argue that the 42 U.S.C. § 1986 claim must be dismissed because Nealy cannot establish an underlying § 1985 claim.

9

1.    Intracorporate conspiracy doctrine

Bohn asserts that because all of the defendants charged with conspiracy were employees of the same governmental entity, i.e., BMCW, the intracorporate conspiracy doctrine bars Nealy's § 1985(2) claims.   A conspiracy cannot exist solely between members of the same entity.   "[M]anagers of a corporation jointly pursuing its lawful business do not become 'conspirators' when acts within the scope of their employment are said to be discriminatory or retaliatory." *Travis v. Gary Cmty. Mental Health Ctr.*, 921 F.2d 108, 109 (7th Cir. 1990).   This intracorporate conspiracy doctrine bars claims against individual employees and officials of a single government entity. *Wright v. Ill. Dep't of Children & Family Servs.*, 40 F.3d 1492, 1508-09 (7th Cir. 1994).  In *Wright*, the doctrine barred a § 1985(2) claim against thirteen employees of the Illinois Department of Children and Family Services. *Id.*

Bohn's argument must be rejected for a simple reason:   not all the alleged conspirators were employees of BMCW.  In counts two and three Nealy asserts that Bohn, Gebhardt, D'Fantis, Brodlo conspired with Nelsen and possibly others.  (Doc. 37 at 19-20.) After Nelsen resigned his position in or around April 2009 he was no longer part of the governmental agency.   Thus, any conspiracy with him following his termination as an employee of BMCW does not fall under the doctrine.

The Second Amended Complaint charges that the conspiracies constituted failure to report Nelsen to the state licensing authority, assisting Nelsen in his child custody dispute with Nealy (count two) and failure to seek the assignment of a separate agency to handle Nealy's state children's court case (count three).  The failure to report Nelsen to the licensing authority was said to have occurred solely after Nelsen left employment at

10

BMCW. Further, any conspiratorial assistance for Nelsen in his child custody dispute and failure to reassign the case that occurred after Nelsen's resignation involved conspiracy with a nonemployee. To the extent that Bohn's (or other BCMW employees') actions before Nelsen's resignation may be at issue, it is possible that Nelsen was not acting on behalf of the entity but on his own, which could cause the intracorporate doctrine to be inapplicable. *See Hartman v. Bd. of Trs.*, 4 F.3d 465, 470 (7th Cir. 1993) ("[W]e should point out that *Travis* probably would not apply where corporate employees are shown to have been motivated solely by personal bias. In that case, the interests of the corporation would have played no part in the employees' collective action . . . .").

Further, the Second Amended Complaint asserts that the state employees conspired with "others," too, and those persons could be nonemployees. The existence of others who were possibly nonemployees again means that the motion to dismiss the allegations on this basis must be denied.

2.    § 1985(2) Elements

Bohn, Brodlo, and Gebhardt all contend that Nealy's conspiracy claims under § 1985(2) fail because the facts in her complaint do not establish any class-based animus, agreement between conspirators, or injury.

Section 1985(2) permits recovery of damages for injury when "two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws." 42 U.S.C. § 1985(2), (3). This provision, applying to conspiracies to obstruct the course

11

of justice in state courts, requires that the conspirators' actions be motivated by an intent to deprive their victims of equal protection. § 1985(2); *Kush v. Rutledge*, 460 U.S. 719, 725, 103 S. Ct. 1483, 1487 (1983).[3]   Accordingly, a plaintiff must allege class-based animus. *Nowicki v. Ullsvik*, 69 F.3d 1320, 1325 (7th Cir.1995); *Wright*, 40 F.3d at 1507; *Hernandez v. Dart*, 635 F. Supp. 2d 798, 810 (N.D. Ill. 2009); *see Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S. Ct. 1790, 1798 (1971) ("The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps other-wise class-based, invidiously discriminatory animus behind the conspirators' action.").

In addition, a plaintiff must allege that defendants entered a conspiracy to interfere with justice in a state court. § 1985(2); *Hernandez*, 635 F. Supp. 2d at 810.  And "[i]t is not enough for a section 1985 plaintiff to plead mere conclusory allegations of a conspiracy. Rather, the plaintiff must plead specific material facts that show the existence of a conspiracy." *Copeland v. Nw. Mem'l Hosp.*, 964 F. Supp. 1225, 1235 (N.D. Ill. 1997); *see Webb v. Goord*, 340 F.3d 105, 111 (2d Cir. 2003) ("The plaintiffs have not alleged, except in the most conclusory fashion, that any such meeting of the minds occurred among any or all of the defendants.  Their conspiracy allegation [under § 1985] must therefore fail."). A plaintiff must show that the conspirators agreed to inflict injury upon her, acting with a single plan the general nature and scope of which each conspirator knew.  *Green v. Benden*, 281 F.3d 661, 665 (7th Cir. 2002).   "Agreement may be inferred from circumstantial evidence, but only if it is sufficient to permit a reasonable jury to conclude

---

[3]The first clause of § 1985(2), not at issue here, provides a cause of action for conspiracy to interfere with the administration of justice in federal courts.  *See* § 1985(2); *Kush*, 460 U.S. at 724.

12

that a meeting of the minds had occurred and that the parties had an understanding to achieve the conspiracy's objectives." *Id.* at 665-66.

Moreover, a § 1985(2) claim requires that the plaintiff be personally injured. *Reichenberger v. Pritchard*, 660 F.2d 280, 287 (7th Cir. 1981) ("[I]t is undisputed that injury to persons or property, or deprivation of a constitutional right is an indispensable element of a claim under § 1985."); *see* § 1985(2) (stating (emphasis added) that "the party *so injured or deprived* may have an action for the recovery of damages occasioned by such injury or deprivation"); *Griffin*, 403 U.S. at 102-03 (indicating that a § 1985(3) claim, which contains the same language regarding injury as for a § 1985(2) claim, requires an injury or deprivation of a right or privilege as a United States citizen).

Nealy asserts that Bohn, Brodlo, Gebhardt, and D'Fantis "conspired with Nelsen and possibly others to impede, hinder, obstruct, or defeat the due course of justice" in three ways:  (1) by failing to report Nelsen to the Wisconsin Department of Regulation and Licensing; (2) by assisting Nelsen in his child custody dispute with Nealy; and (3) "by failing to seek the assignment of a separate agency to handle ongoing case management of Ms. Nealy's children's CHIPS case, despite the obvious conflict [of] interest the Agency had." (Doc. 37 at 19-20.)  For the following reasons, all three conspiracy claims must be dismissed.

         a.    Class-based animus

Regarding the three alleged conspiracies, Nealy's proffered facts fail to set forth any basis for finding class-based animus, as required for a § 1985(2) claim.  Indeed, she does not tender any facts supporting even "class of one" animus.

13

Devoid from the Second Amended Complaint is any indication of Nealy's race. In her briefs opposing the motions to dismiss Nealy says she is African-American, but she never asserted that claim in the Second Amended Complaint. Even taking the representation in Nealy's briefs as true, nothing else in the Second Amended Complaint suggests that the defendants' conduct was based on animus toward African-Americans. At most, the facts plead imply that Bohn, Brodlo, and Gebhardt favored Nelsen over Nealy because he was a coworker.

The Second Amended Complaint does assert that Nealy suffers from anxiety disorder and obsessive-compulsive personality disorder, with schizoid, paranoid, and narcissistic features; she has been receiving psychiatric care since at least 2004; and she has been diagnosed with bipolar depression. (Doc. 37 at 4.) Though Nealy does not expressly claim that she belongs to a class of persons with mental illness, that allegation can be inferred from her pleading.[4] But nowhere does Nealy assert, or even imply, that Bohn, Brodlo, or Gebhardt took any action involving her or her children because of animus toward the mentally ill. Moreover, nothing in the Second Amended Complaint suggests a dislike of the mentally ill by any of these defendants or actions by these defendants consistent with personal animus. Again, at most, the facts set forth in the pleading imply that Bohn, Brodlo, and Gebhardt favored Nelsen over Nealy because he was a coworker.

It is unclear whether a § 1985(2) claim may be brought under a "class of one" theory. *See, e.g.*, *Unger v. Blevins-Foster*, No. 1:12-cv-00948-LJM-TAB, 2013 WL 2456073, at *11 (S.D. Ind. June 6, 2013); *Scarlato v. Vill. of Bellwood, Ill.*, No. 08 C 546,

---

[4]Animus against the mentally ill or deficient may be considered class-based animus under § 1985(2) or (3). *See Lake v. Arnold*, 112 F.3d 682, 688 (3d Cir. 1997).

14

2008 WL 244318, at * 1 (N.D. Ill. Jan. 28, 2008). But the Second Amended Complaint lacks even a hint of class-of-one animus by the defendants toward Nealy, and Nealy does not argue class-of-one animus in her briefs.

> The typical equal protection case involves discrimination by race, national origin or sex. However, the [Equal Protection] Clause also prohibits the singling out of a person for different treatment for no rational reason. To state a class-of-one equal protection claim, an individual must allege that he was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."
>
> The classic class-of-one claim is illustrated when a public official, "with no conceivable basis for his action other than spite or some other improper motive . . . comes down hard on a hapless private citizen."

*Swanson v. City of Chetek*, No. 10-1658, ___ F.3d ___, 2013 WL 3018926, at *3 (7th Cir. June 19, 2013) (citations omitted). The Second Amended Complaint is devoid of any allegation that Nealy was intentionally treated differently from others similarly situated. Indeed, Nealy underscores this shortcoming by asserting that she was treated the *same* as others. She adds that the BMCW had a history of not reporting discipline of its employees to the state licensing authority. Thus, as to the failure to report Nelsen's discipline Nealy was treated *similarly* to other persons.

        b.    Agreements

Nowhere in the Second Amended Complaint has Nealy pled facts suggesting an agreement between defendants Bohn or Gebhardt and Nelsen (or others) to injure Nealy. Brodlo is a closer call, yet still Nealy's pleading falls short.

        I.    Gebhardt

Factual allegations regarding Gebhardt are noticeably absent. Except for the conclusory paragraphs charging conspiracy in violation of § 1985(2) and failure to act in violation of § 1986, Nealy mentions Gebhardt by name in only two paragraphs:

15

10.     At all times relevant to the allegations set forth in this Complaint, Matt Gebhardt was a second-line supervisor of Nelsen with the Bureau of Milwaukee Child Welfare.  On information and belief, Mr. Gebhardt is a resident of Wisconsin.

. . . .

56.     On April 9, 2009, Nelsen stated in writing to BMCW Supervisor Matt Gebhardt:

> Since her (the baby's) placement with me, I have dropped off and picked up [the baby] from the house of Ms. Nealy in full view of her visitation worker.  During a recent visit to her children's dental appointment, I brought [the baby] into the clinic and was greeted by Ms. Nealy's ongoing case manager.  My point is in these statements is; (sic) I made little effort to hide that I was the father of [the baby]."

(Doc. 37 at 3, 9 (alterations in original).)  Also, Gebhardt is referenced generally as one of the "defendants" who acted as employees of the BMCW and as licensed social workers.  Moreover, he is among the "persons" described as acting under color of law for purposes of § 1983, and acting within the scope of their employment with respect to the matters at issue.  (Doc. 37 at 17-18.)

These meager allegations set forth no plausible claim of conspiracy by Gebhardt.  Simply describing Gebhardt as occupying the position of a second-line supervisor and as the recipient of a letter from Nelsen concerning Nealy and the baby, fails to articulate a plausible § 1985(2) conspiracy claim.  Such statements do not establish that Gebhardt took any action or made any agreement with any person and thereby engaged in a conspiracy.

Nevertheless, Nealy contends that her allegations indicated Nelsen told a reporter that he left BMCW on good terms and unidentified persons at BMCW told him "they" would help him find another position with the state (Doc. 82 at 3 & n.1); that Nelsen told Leah Chase, the case worker assigned to Nealy after his resignation, that Gebhardt and Bohn had been very gracious and looked up Nealy's history (Doc. 82 at 4); and that Gebhardt

16

failed to report Nelsen to the state licensing department or police. Thus, she maintains that a conspiracy has been properly alleged.

Even if these assertions were set forth in the complaint, still missing is any glimmer of an agreement between Gebhardt and anyone else. Furthermore, the Second Amended Complaint lacks any assertion that it was within Gebhardt's duties as an employee of BMCW to report Nelsen to a licensing authority. The only specific references in the complaint relating to a failure to report suggest that it was Bohn's responsibility.

In sum, even construed in light of the arguments in Nealy's brief, the complaint fails to assert any agreement between Gebhardt and Nelsen or Gebhardt and others.

ii.     Bohn

Nealy offers a bit more regarding Bohn, but nothing suggesting an agreement supporting a § 1985(2) claim. She contends that (1) Bohn "never notified the Children's Court about the clear conflict of interest that existed between [BMCW] and Ms. Nealy"; (2) as deputy director of BMCW, Bohn "allowed BMCW to investigate Nelsen's claim that Ms. Nealy had wrongfully taken custody of her own child" while Nelsen had no custody or placement order; (3) Bohn did not report Nelsen to the state licensing department; (4) as deputy director of BMCW and a supervisor, Bohn "allowed BMCW to continue to monitor Ms. Nealy's CHIPS case involving the December 21, 2007 seizure of her older children"; and (5) as deputy director of BMCW and a supervisor, Bohn "allowed BMCW to investigate Nelsen's CHIPS claim about the baby, which resulted in Nelsen having the baby returned to him before he had any legal right to the child." (Doc. 46 at 4-5; *see also id.* at 9.) Like Gebhardt, Bohn is referenced generally as one of the defendants who acted as employees of the BMCW, as a licensed social worker, and as one of the "persons" who acted under

17

color of law for purposes of § 1983, and within the scope of employment. (Doc. 37 at 17-18.)

Conspicuously absent from these allegations is any link between Bohn and Nelsen or other possible conspirators. At most, these contentions suggest that Bohn was negligent in doing her job. But they do not mention an agreement between Bohn and anyone else concerning Bohn's conduct toward Nealy.

Regardless, Nealy argues that a cover-up among several public officials constitutes a conspiracy to obstruct legitimate efforts to seek relief from the courts. (Doc. 46 at 12.) But the Second Amended Complaint does not refer to any cover-up jointly made by several public officials. Instead, it asserts separate actions by separate officials

        iii.    Brodlo

Nealy asserts that (1) Brodlo was a "first-line supervisor of Nelsen" with BMCW and a resident of Wisconsin; (2) on at least one occasion in early 2009 Nelsen brought the baby to work and Brodlo played with her; (3) after Nelsen resigned from BMCW, Brodlo advised Nelsen about his child custody issues regarding Nealy's child; and (4) in October 2009 when Nealy attempted to regain custody of the baby Nelsen said he had spoken to his supervisor, meaning Brodlo, and BMCW decided he could keep the baby. (Doc. 37 at 3, 8, 15.) Like Gebhardt and Bohn, Brodlo is referenced generally as one of the defendants who acted as employees of the BMCW as a licensed social worker, and as one of the "persons" who acted under color of law for purposes of § 1983, and within the scope of employment. (Doc. 37 at 17-18.)

As to any failure to report Nelsen to the licensing authority, the Second Amended Complaint does not state any plausible claim against Brodlo. Nothing in the pleading or

18

Nealy's briefs suggests Brodlo had any hand in disciplining employees or reporting discipline to state authorities. However, it does include just enough to suggest, inferring *very* broadly from thin allegations, that Brodlo and Nelsen had an understanding that Brodlo would assist or advise Nelsen regarding his child custody issue involving the BMCW, for whom Brodlo worked. Regardless, because Nealy fails to set forth any class-based or class-of-one animus the claims will not proceed.

   c. Injury

   Additionally, even if all allegations are true and in Nealy's favor, the Second Amended Complaint fails to assert any injury to Nealy resulting from Bohn's (or anyone else's) failure to report Nelsen's termination to the licensing board or the BMCW's failure to assign another agency to her case. Nealy argues that the BMCW's failure to disclose Nelsen's conduct to an outside agency "hampered" her, as a potential litigant, in pursuing claims against the agency. (Doc. 46 at 5.) But the court finds it implausible that Nelsen's licensure had anything to do with a claim by Nealy against BMCW or its employees, and claims must be plausible to pass the test of a Rule 12(b)(6) motion. Nor does the mere fact that the BMCW was involved in her case mean that she was hindered or impeded in state-court proceedings.

B. § 1986 Claims

   Section 1986 provides that

> [e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured.

19

A claim under § 1986 is derivative of § 1985 liability. Thus, the absence of a § 1985 claim would require dismissal of a § 1986 claim. *Keri v. Bd. of Trs. of Purdue Univ.,* 458 F.3d 620, 643 (7th Cir. 2006); *Rodgers v. Lincoln Towing Serv., Inc.*, 771 F.2d 194, 203 (7th Cir. 1985). Here, the Second Amended Complaint does not support Nealy's conspiracy claims as discussed above. Consequently, Nealy cannot establish a claim under § 1985. It follows that her § 1986 claims against defendants Bohn, Brodlo, and Gebhardt fail as well.

C.    § 1983 Claim(s)

In the portion of her Second Amended Complaint under the heading of count one, based on § 1983, Nealy mentions only Nelsen by name. She asserts that Nelsen's conduct was unlawful, caused her harm and violated her due process rights as a result of his sexual conduct with her. Regarding the other defendants Nealy asserts only that they are "persons" under § 1983, that they acted within the scope of their employment, and that the State of Wisconsin is liable for any judgment against them because they acted within the scope of their employment. (Doc. 37 at 18-19.[5]) Alone, these contentions do not set forth any basis for concluding the defendants violated any of Nealy's constitutional rights. Thus, these defendants understandably presumed that they were not named in this count and did not challenge this count in their initial briefs. But in response to Brodlo's and Gebhardt's motions to dismiss Nealy wrote that their conduct also violated § 1983, pointing to page 18 of the Second Amended Complaint (which, as discussed above, does not set forth any claim against Bohn, Brodlo or Gebhardt). (Doc. 71 at 13, Doc. 82 at 11.) Brodlo and Gebhardt replied, contending that the Second Amended Complaint fails to identify the

_____

[5]Also, Nealy asserts that the BMCW continues to retaliate against her and manipulates her access to her child. (Doc. 37 at 19.) But the BMCW is no longer a party to this lawsuit.

20

conduct underlying the claim and that the complaint as a whole failed to state a claim for any constitutional violation. (Doc. 84 at 3; Doc. 83 at 3-4.)

To state a claim for relief under § 1983 Nealy must allege that (1) she was deprived of a right secured by the Constitution or laws of the United States, and (2) that the defendants acted under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Waubanascum v. Shawano Cnty.*, 416 F.3d 658, 665 (7th Cir. 2005). Here, the second element is met; defendants Gebhardt, Bohn, and Brodlo are (or were at the time of the actions at issue) BMCW employees. Moreover, they do not dispute for purposes of this motion that they acted under color of state law. However, the Second Amended Complaint fails to put Bohn, Brodlo, and Gebhardt on notice regarding what conduct violated § 1983 or plausibly assert any constitutional violations by these defendants. For instance, as was true with the § 1985(2) claim asserted against Gebhardt, occupying a position as a supervisor and receiving a letter from an employee while acting within the scope of public employment does not amount to any constitutional violation. Also, the doctrine of respondeat superior does not apply to § 1983 actions. *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001).

Nealy maintains that Gebhardt's actionable conduct includes his failure to report anything about Nelsen bringing a baby to the office and failure to report Nelsen to the licensing authority or law enforcement. However, the Second Amended Complaint does not allege that Gebhardt saw the baby at the office or had any responsibility regarding state license reporting. Further, it does not place Bohn and Brodlo on notice as to what actions or inaction on their part violated § 1983.

21

D.     A Note on Nealy's Alternative Argument

Nealy contends that the pending motions to dismiss would best be treated as premature motions for summary judgment and that a stay for discovery is required. She contends that with further discovery she will be able to unearth facts necessary to refine her conspiracy claims. (*See, e.g.*, Doc. 71 at 20-26.) She argues that the court "will benefit from information outside of the Second Amended Complaint" (Doc. 71 at 21) and that she intends to discover evidence that the named defendants other than Nelsen knew about Nelsen's sexual misconduct before the W-2 social worker learned of it, acted with a discriminatory animus, and had a meeting of the minds (Doc. 71 at 24).

But Nealy's attorney appears to misunderstand the role of pleadings and discovery. Discovery follows the pleading of a complaint that sets forth a claim for relief. First, a plaintiff must pass the hurdles set by Rule 8 and 12(b)(6), *Bell Atlantic*, and *Iqbal*. If Nealy's counsel has a good faith belief that there is evidence supporting her claims she should have plead them. Instead, the Second Amended Complaint relies predominantly on the wrongdoing of Nelsen and conclusory statements about the other defendants, with no particulars offered to support them. As indicated by *Bell Atlantic* and *Iqbal*, factual allegations must be specific enough to justify dragging a defendant into court. As the First Circuit wrote even before *Bell Atlantic* and *Iqbal*, "the price of entry, even to discovery, is for the plaintiff to allege a *factual* predicate concrete enough to warrant further proceedings, which may be costly and burdensome. Conclusory allegations in a complaint, if they stand alone, are a danger sign that the plaintiff is engaged in a fishing expedition." *DM Research, Inc. v. College of Am. Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999).

22

MOTION FOR SUMMARY JUDGMENT

The Second Amended Complaint submits that D'Fantis "was a supervisor of ongoing case managers" with the BMCW and a resident of Wisconsin. (Doc. 37 at 3.) It contends that Nealy disclosed the identity of the baby's father to D'Fantis in late February 2009, and D'Fantis's visit notes from March 27, 2009, discuss Peter Nelsen as the baby's father. On April 3, 2009, Nealy again told D'Fantis that Nelsen was the baby's father and gave D'Fantis his phone number. (Doc. 37 at 8.) At that point, according to the Second Amended Complaint, Bohn, Brodlo, Gebhardt, and D'Fantis conspired with Nelsen and others to "impede, hinder, obstruct, or defeat the due course of justice" in the three § 1985(2) conspiracies discussed above and violated § 1986. (Doc. 37 at 19, 20.)

As to the § 1985(2) and § 1986 claims, the foregoing discussion applies. The pleading fails to plausibly assert any class-based or class-of-one animus agreement by D'Fantis, and injury required to prove claims under § 1985(2), and § 1986. In addition, summary judgment is warranted for the reasons discussed below.

Summary judgment is proper if the depositions, documents or electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials show that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a),(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend each element of its cause of action, showing a genuine issue for trial. *Id.* at 322-34. In analyzing whether a

23

question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. To establish that a question of fact is "genuine," the nonmoving party must present specific and sufficient evidence that, if believed by a jury, would support a verdict in his favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249.

A. Nealy's Lack of Information and Desire for More Discovery

Local rules for this district require parties filing and responding to a summary judgment motion to submit, respectively, statements of proposed material fact and responses to the opposing party's statements. Civil L.R. 56(b). Civil L.R. 56(b)(2)(B)(I) dictates that a response to a proposed finding of fact, other than an admission, must include "specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon." Uncontroverted statements of material fact are deemed admitted for the summary judgment motion. Civil L.R. 56(b)(4).

Nealy responded to many of defendant's proposed facts with statements such as "Plaintiff does not have sufficient information to confirm or deny this proffered fact due to lack of discovery" (Doc. 79 at 3, ¶ 6) and "Plaintiff has received no discovery to be able to dispute or agree" (Doc. 79 at 4, ¶ 10). Instead of providing a citation to evidence

24

supporting a denial she rests her denial on a lack of discovery and inability to conduct discovery.

Federal Rule of Civil Procedure 56(d) states:

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

Nealy did not file a motion under Fed. R. Civ. P. 56(d) for more discovery. However, in response to the motion for summary judgment she contended that a stay for discovery under Fed. R. Civ. P. 56 is proper.[6] (Doc. 78 at 19-24.)

Nealy's contention that she has not obtained adequate discovery is insufficient for the denial of D'Fantis's proposed facts. Nealy filed her complaint on June 6, 2011, naming Nelsen and state agencies as defendants. (*See* Doc. 1 at 1, 3.) She dropped the state agency defendants in her Amended Complaint, but added John and Jane Doe employees of the BMCW, "whose identities will be determined via discovery in this matter." (Doc. 20 at 2.) Counsel for Nealy and Nelsen conducted a Fed. R. Civ. P. 26(f) conference on March 27, 2012 (Doc. 26 at 4), and the court held a scheduling conference on April, 3, 2012, at which it was decided that the parties would complete fact discovery by October 1, 2012 (Doc. 29 at 1).

Defendants Bohn, Brodlo, Gebhardt, and D'Fantis were added to the case in the Second Amended Complaint filed July 18, 2012, after the discovery schedule was set. At a status conference on November 9, 2012, the court granted Nealy an additional thirty days

---

[6]Nealy refers to Fed. R. Civ. P. 56(f), presumably to the form of that subdivision that existed in 2010 and before, when the provision was renumbered as Rule 56(d) and reworded. *See* Fed. R. Civ. P. 56 advisory committee's notes 2010 amendments.

25

from that date to conduct discovery with Nelsen. (Doc. 63 at 1.) At that conference, counsel for Nelsen indicated that Nelsen had been deposed. (Doc. 63 at 2.) Other documents in the file, confirmed by Nealy's attorney's statements at the conference (Doc. 63 at 4), suggest that Nelsen's deposition lasted four hours, with another four hours to be scheduled subsequently because of counsels' calendars. It appears that the deposition never resumed, and as mentioned above, Nelsen never provided required written discovery. At the November 9 conference Nealy's counsel indicated she would like to complete discovery with Nelsen then proceed to alternative dispute resolution. (Doc. 63 at 4.)

Nealy says that through further discovery from the other defendants she will be able to prove that defendants participated in a cover-up of Nelsen's conduct. (*See, e.g.*, Doc. 78 at 23.) However, she was given time to conduct discovery, even considering Nelsen's noncompliance with discovery requirements. Under Fed. R. Civ. P. 26(a)(1)(D), a party that is served or joined to the action after the Rule 26(f) conference must provide initial disclosures within thirty days after being served or joined, unless a different time is set. Nealy admits that D'Fantis complied in early January 2013, and Nealy's response to the summary judgment motion was filed on February 5, 2013.[7] Further, Rule 26(d) indicates that a party may seek discovery from any source once the Rule 26(f) conference has occurred. Thus, when the four additional defendants were named Nealy could have proceeded with discovery, especially as to D'Fantis, who answered the complaint. The court perceives no barrier to Nealy's propounding of discovery on D'Fantis, Bohn, Brodlo

---

[7]Bohn, Brodlo, and Gebhardt did not comply, but Nealy could have moved to compel their initial disclosures. However, she did not.

or Gebhardt or third parties such as other employees of the BMCW or La Causa. That Nealy did not serve discovery on them is not a basis for now delaying consideration of D'Fantis's summary judgment motion. That Nealy may have first wanted discovery from Nelsen does not excuse her lack of action as to discovery from the other defendants; she could not assume that the discovery would continue indefinitely simply because Nelsen did not cooperate first.

With regard to defendant D'Fantis, Nealy had several months to conduct discovery before the deadline ran. If she needed more time counsel should have spoken up at the November 9 conference. Moreover, Donald Carlson, one of D'Fantis's attorneys, swears that he told Nealy's attorney in mid-December 2012 that he would answer questions about D'Fantis's role in the alleged events if counsel submitted the questions to him by the end of the year. (Doc. 80, ¶ 2.) However, plaintiff's attorney never submitted any written questions for D'Fantis to answer. (*Id.,* ¶ 3.)

Because Nealy had ample time and opportunity to conduct discovery with D'Fantis, Nealy's reliance on a lack of discovery is an insufficient response to the proposed facts. Accordingly, any statements of fact to which Nealy objected due to a lack of discovery will be deemed admitted for purposes of the summary judgment motion.

B.     Problems with Nealy's Additional Proffered Facts

In response to the summary judgment motion, Nealy proposed additional facts under Civil L.R. 56b)(2)(B)(ii). However, several of the facts are unsupported by evidence. For many facts, counsel cites to newspaper articles. However, newspaper articles offered for the truth of what they report are inadmissible hearsay. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). "And hearsay is inadmissible in summary judgment

27

proceedings to the same extent that it is inadmissible in a trial," with the exception that affidavits and depositions, i.e., recorded sworn statements, are allowed. *Id.* Thus, the court has disregarded proposed findings that cite only newspaper articles for the truth of their contents.

Other proposed findings point to four exhibits that are unauthenticated; the documents were attached to Nealy's proffered facts without affidavit (*see* Doc. 79). D'Fantis disputes all facts set forth by plaintiff that cite to Exhibits 1 through 4. However, notwithstanding Nealy's technical failure to authenticate Exhibits 1, 2, and 4, the court will accept them as evidence for now, as the documents appear to come from Nealy's records or case files at the BMCW or Wisconsin Department of Children and Families. The court assumes that these documents could be authenticated at trial. Rather than stay the motion until the documents are authenticated the court will consider them. However, the court will not accept Exhibit 3, as it was acquired from a website, which is not considered proper evidence. Like a newspaper article, contents of a website are out-of-court statements that are considered hearsay if offered to prove the truth of their contents. *See* Fed. R. Evid. 801(c). Thus, the court will disregard any proposed facts relying solely on the contents of the website print-off.

A couple proposed facts from Nealy cite to a Decision and Order of Magistrate Judge Aaron E. Goodstein in *Estate of Will R. Johnson v. La Causa, Inc.*, No. 10-C-953, slip op. (E.D. Wis. filed June 24, 2011). Although the court may take judicial notice of the existence of that document, and although this court assumes the accuracy of Magistrate Judge Goodstein's statements, the proposed facts are immaterial to the present matter. Therefore, they are disregarded. (*See* Doc. 79 at 10, ¶¶ 4, 5.) The court has also

28

disregarded other proposed facts that are irrelevant.  (*E.g.*, Doc. 79 at 12, ¶ 19; *id.* at 13, ¶¶ 27, 28.)

Finally, some proposed findings from Nealy are not supported by the evidence cited. For instance, proposed fact ¶ 15 cites to Exhibit 1 "at 607" to establish that after receiving the name of the baby's father "D'Fantis conducted no follow-up regarding this information." (Doc. 79 at 11, ¶ 15.)  The court sees no such page number.  Instead, it sees Bates numbers between 000337 and 000363.  If Nealy meant to type "6-7" of Document 79-1 that entry relates to home visit notes (not even entered into the records by D'Fantis) and does not cover what D'Fantis may have been working on outside of that visit.  Such unsupported proposed facts have been disregarded, as have those that are not complete sentences and make no sense (*e.g.*, Doc. 79 at 11, ¶ 16).

C.      Statement of Undisputed Facts

D'Fantis is a social worker who was employed by La Causa at the time of the alleged misconduct. (Doc. 70, ¶ 4.[8]) La Causa contracted with the BMCW to provide child protective case management services.  (Doc. 70, ¶ 5.)  BMCW employees provided the initial assessment and up-front investigation into child welfare matters; La Causa took over once a child was removed from a home until the child was brought to permanency.  (Doc. 70 ¶ 6.)   Although La Causa worked with the BMCW, the two organizations were completely separate and the BMCW had no direct supervision over La Causa.  (Doc. 70,

---

[8]If only Document 70 is cited, Nealy either agreed to the proposed statement or her objection for lack of discovery has been overruled as discussed above.

29

¶ 7; Doc. 79 at 3, ¶ 7.[9])  La Causa employees and BMCW employees had little to no interaction with each other on any given case and D'Fantis had no contact with any of the other named defendants during the time of the alleged events.  (Doc. 70, ¶ 8; Doc. 79 at 4, ¶ 8.)

In early fall 2008, D'Fantis was employed by La Causa as a training team supervisor; she oversaw approximately five new trainees and their individual caseloads.  (Doc. 70, ¶¶ 9, 10.)  In November 2008, Enrique Lockhart, one of D'Fantis's trainees, was assigned as Nealy's case worker.  (Doc. 70, ¶ 11.)  Nealy's case was already open and had been transferred to Lockhart from another case worker who was no longer at La Causa.  (Doc. 70, ¶ 12.)  At that time, Nealy had two children in out-of-home care and an infant that remained in her care.  (Doc. 70, ¶ 13.)  At that time, D'Fantis did not know who the father of the infant was; she sought his identity so the social worker could perform background checks on him.  (Doc. 70, ¶ 14; Doc. 79 at 5, ¶ 14.)

D'Fantis entered her case notes in the same system as that used by BMCW.  (Doc. 79 at 11, ¶ 12.)  D'Fantis had access to Nealy's case history, which included information regarding the intake workers previously assigned to Nealy's case.  (Doc. 79 at 11, ¶ 13.)

On February 16, 2009, D'Fantis and Lockhart visited Nealy.  (Doc. 70, ¶ 15.)  While at Nealy's home D'Fantis learned there was no crib for the infant.  (Doc. 79 at 11, ¶ 17; Doc. 79-1 at 6.)  In due course, D'Fantis asked Nealy about the infant's whereabouts.  (Doc. 79 at 11, ¶ 14; Doc. 79-1 at 6.)  D'Fantis again asked Nealy to reveal the identity of

---

[9]Nealy objects to this proposed finding but her response cites to no evidence controverting the proposed statement.  Nealy says that D'Fantis entered case notes in the same case management system as BMCW, showing that "La Causa was inextricably intertwined with the BMCW," but even if accepted (no citation supports it), that fact does not establish such intertwining.

the baby's father because she knew he would be around plaintiff's other children. (Doc. 70, ¶ 16; Doc. 79 at 12, ¶ 18.) Nealy wrote down the name of Peter Nelsen on a piece of paper. (Doc. 70 ¶¶ 17, 18.) D'Fantis did not recognize the name and remained concerned because of the hesitation Nealy showed when disclosing the name. (Doc. 70, ¶ 18, 19.) D'Fantis tried to get Nealy to reveal more information about the father. (Doc. 70, ¶ 20; Doc. 79 at 7, ¶ 20.[10])

Prior to this time, in January of 2009, the infant's last name had been changed to Nelsen. (*See* Doc. 79 at 13, ¶ 27; Doc. 88 at 19, ¶ 27; Ex. 2 at 3; Ex. 4 at 3.)

On February 24, 2009, Lockhart, who was being trained by D'Fantis, observed defendant Nelsen drop off and pick up Nealy from an appointment with her children. (Doc. 79 at 12, ¶ 20; Doc. 79-1 at 8-9.)

Nealy's children visited Nealy at BMCW's Region 3 office on March 3, 2009; D'Fantis and Lockhart attended the meeting. (Doc. 79 at 12, ¶ 25; Doc. 79-1 at 9.) Apparently, Nelsen was present at Region 3 on April 8, 2009. (Doc. 79-1 at 3; *see* Doc. 79 at 12, ¶ 26.)

On March 27, 2009, D'Fantis contacted a W-2 liaison and accessed a W-2 database; she discovered that Nealy was receiving W-2 benefits only for the infant fathered by Nelsen, not for her other children. (Doc. 79 at 12, ¶¶ 22, 23; Doc. 79-1 at 12.) That day, Nealy admitted that the infant lived with Nelsen full time. (Doc. 79 at 12, ¶ 21; Doc. 79-1 at 12.)

---

[10]Plaintiff disputes this fact by stating that D'Fantis's efforts to try to persuade plaintiff to reveal more information about the father are not reflected in BMCW case notes. However, a lack of information in BMCW case notes does not overcome D'Fantis's sworn statement that she tried to get more information about Nelsen.

31

On April 3, 2009, Nealy gave D'Fantis Nelsen's phone number. (Doc. 70 ¶ 21.) Later that day, D'Fantis left Nelsen a message advising him to call Tracey Clark to discuss placement and custody of the infant. (Doc. 70 ¶ 22.) Nealy's case had been transferred to Clark, as Lockhart had graduated off D'Fantis's team. (Doc. 70, ¶ 23.) Also on April 3, 2009, D'Fantis examined the list of case workers assigned to Nealy's child custody case and discovered that a Peter Nelsen had been assigned as an initial assessment worker. (Doc. 70 ¶ 24.) D'Fantis then contacted her supervisor, Darleen Pawluk, to inform her of the situation. (Doc. 70 ¶ 25.) After she contacted her supervisor, D'Fantis was removed from the case. (Doc. 70, ¶ 26; Doc. 79 at 8-9, ¶ 26.)

C.     Discussion

1.     § 1985(2) and § 1986 Claims

The undisputed facts show that D'Fantis did not know who Nelsen was at the time Nealy disclosed that he was the baby's father. Moreover, once D'Fantis discovered that Nelsen was Nealy's initial assessment worker, she contacted her supervisor and her involvement in the case ended. Nothing in the record establishes that D'Fantis knew who Nelsen was or had any communication with him before she left a message asking him to call Clark. Moreover, the undisputed facts show that D'Fantis had no contact with any of the other named defendants during the time of the alleged misconduct. No evidence indicates that D'Fantis even knew any of the other named defendants. Nor does any evidence suggest that D'Fantis conspired with *anyone* regarding Nealy's case. Nealy has failed to proffer any evidence showing the existence of a conspiracy to hinder, obstruct, or defeat the due course of justice.

32

In addition to Nealy's failure to allege class-based animus or injury based on D'Fantis's actions, no reasonable juror could find in her favor as to conspiracy. Thus, summary judgment must be granted on the § 1985(2) claim. Inasmuch as the § 1986 claim depends on the existence of a § 1985 conspiracy, summary judgment must be granted on the § 1986 claim as well.

2.      § 1983 Claim

As the foregoing discussion indicates, Nealy's § 1983 claim requires her to show that (1) she was deprived of a right secured by the Constitution or laws of the United States, and (2) that D'Fantis acted under color of state law. *Gomez*, 446 U.S. at 640; *Waubanascum*, 416 F.3d at 665.

The undisputed facts show that D'Fantis was an employee of La Causa, not BMCW and there is no indication that La Causa is the state's alter ego. Private persons act "under color of law" for purposes of § 1983 when they conspire or act jointly with state officials. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 152 (1970), *overruled on other grounds by Celotex*, 477 U.S. 317; *Tarpley v. Keistler*, 188 F.3d 788, 791-93 (7th Cir. 1999). As discussed above, the undisputed evidence shows no conspiracy between D'Fantis and state officials. Nor does the evidence support any reasonable jury verdict of joint action. D'Fantis did not know Nelsen and the other defendants.

Finally, mere negligence does not provide a basis for § 1983 liability. *Waubanascum*, 416 F.3d at 670. Nealy contends that D'Fantis should have cross-checked Nealy's files more quickly to discover Nelsen's relationship to her case and should have done more when she realized that Nelsen had been assigned to Nealy as a social worker. At most, a reasonable jury could find these inactions amounted to negligence. However,

33

no intentional coverup by D'Fantis can be gleaned from the record before this court. Thus, the court will grant summary judgment in D'Fantis's favor.

CONCLUSION

For the reasons set forth above,

IT IS ORDERED that Nealy's motion for default judgment against Nelsen (Doc. 55) is granted. The order for default judgment extends to liability only, as damages have not yet been determined.

IT IS FURTHER ORDERED that the motions to dismiss filed by Bohn (Doc. 40), Brodlo (Doc. 57), and Gebhardt (Doc. 65) are granted.

IT IS FURTHER ORDERED that D'Fantis's motion for summary judgment (Doc. 67) is granted.

IT IS FURTHER ORDERED that a telephonic status conference is set for August 27, 2013, at 3:00 PM, at which time the court will discuss further proceedings with counsel for Nealy and the Intervening Defendant.

Dated at Milwaukee, Wisconsin, this 29th day of July, 2013.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE

34